NIAGARA MOHAWK POWER
CORPORATION,
Plaintiff,

v.

CONSOLIDATED RAIL CORPORA-
TION; the King Service, Inc.; United
States Steel Company; Edwin D.
King; Lawrence King; Richard B.
Slote; Chevron U.S.A., Inc.; Portec,
Inc.; and American Premier Under-
writers, Inc.; Defendants.

Chevron, U.S.A., Inc., Third-
party Plaintiff,

v.

The County of Rensselaer; and the
County of Rensselaer Sewer District
No. 1, Third-party Defendants.

No. 5:98–CV–1039.

United States District Court,
N.D. New York.

Nov. 6, 2003.

See also 97 F.Supp.2d 454.

Niagara Mohawk Power Corporation Plaintiff, Syracuse, NY, John T. Parkinson, Esq., Managing Counsel.

Swidler, Berlin, Shereff, Friedman, L.L.P., Attorneys for Plaintiff, Washington, D.C., Milissa A. Murray, Esq., Thomas R. Lotterman, Esq., of counsel.

Menter, Rudin & Trivelpiece, P.C., Attorneys for Defendant Consolidated Rail Corporation, Syracuse, NY, Thomas Joseph Fucillo, Esq., of counsel.

Whiteman & Osterman, Attorneys for Defendants King Service, Inc., Edwin D. King, Lawrence King, and Richard B. Slote, Albany, NY, Joseph D. Stinson, Esq., Scott T. Decker, Esq., of counsel.

USX Corporation, Pittsburgh, PA, David L. Smiga, Esq., of counsel.

Devorsetz, Stinziano, Gilberti, Heintz & Smith, P.C., Attorneys for Defendant United States Steel Company, Syracuse, NY, Kevin C. Murphy, Esq., Timothy J. Lambrecht, Esq., of counsel.

Lafave & Associates, Attorneys for Defendant and Third-party Plaintiff Chevron U.S.A., Inc., Delmar, NY, Patrick J. Higgins, Esq., of counsel.

Bond, Schoeneck & King, Attorneys for Defendant Portec, Inc., Albany, NY, Arthur J. Siegel, Esq., Kimberlee S. Parker, Esq., of counsel.

Orrick & Herrington, Attorneys for Defendant American Premier Underwriters, Inc., New York, NY, James J. Capra, Jr, Esq., Siobhan A. Handley, Esq., of counsel.

Office of Rensselaer County Attorney, Attorney for Third-party County Defendants, Troy, NY, Stephen A. Pechenick, Esq., of counsel.

## MEMORANDUM–DECISION AND ORDER

HURD, District Judge.

ABBREVIATIONS USED THROUGHOUT:

APU—defendant American Premier Underwriters, Inc.

BTEX—benzene, toluene, ethylbenzene and zylenes

BTU—British Thermal Unit

Chevron—defendant & third-party plaintiff Chevron U.S.A., Inc.

CERCLA—Comprehensive Environmental Response Compensation & Liability Act of 1980

Conrail—defendant Consolidated Rail Corporation

Consent Order—Order on Consent between NiaMo and DEC

DEC—New York State Department of Environmental Conservation

GC/FID—gas chromatography/flame ionization detection

GC/MS—gas chromatography/mass spectrometry

I–787 Interstate Highway 787

King—defendants King Service, Inc., Edwin D. King, Lawrence King & Richard B. Slote

MGP—manufactured gas plant

NiaMo—plaintiff Niagara Mohawk Power Corporation

NCP—National Contingency Plan

PAHs—polynuclear aromatic hydrocarbons

Portec—defendant Portec, Inc.

PRP—potentially responsible person under CERCLA, 42 U.S.C. § 9607(a)

PSA—Preliminary Site Assessment

Rensselaer defendants—third-party defendants County of Rensselaer & County of Rensselaer Sewer District No. 1

Republic Steel—Republic Steel Corporation

SVOCs—semivolatile organic compounds

TCA—trichloroethane

TCE—trichloroethylene

Water Street Site—Troy Water Street Site in Troy, New York

UCM—unresolved complex mixture found on chromatogram

USX—defendant United States Steel Company

VOCs—volatile organic compounds

TROY WATER STREET SITE MAP

TABLE OF CONTENTS

I. INTRODUCTION ............................................................. 111

II. BACKGROUND ............................................................ 112
 A. The NiaMo/DEC Consent Order ..................................... 112
 B. Water Street Site and the Parties ................................... 113
 C. Manufactured Gas Plant Operation ................................. 115
 D. Theories of CERCLA Liability ...................................... 116
 1. Conrail .......................................................... 116

 2. APU ........................................................116
 3. King ........................................................116
 4. USX ........................................................116
 5. Chevron ....................................................117
 6. Portec......................................................117
 7. Rensselaer Defendants ......................................117
 8. Counterclaims and Cross-claims .............................117
 E. State Law Theories of Liability ................................117

III. LEGAL STANDARDS ............................................118
 A. Motion to Dismiss .............................................118
 B. Summary Judgment ...........................................118
 C. Expert Testimony .............................................118
 D. CERCLA .....................................................119

IV. ANALYSIS ......................................................121
 A. NiaMo's Motion to Dismiss Counterclaims .....................121
 1. CERCLA Contribution Protection .........................121
 2. Failure to State a Claim ..................................122
 3. Compliance with Fed.R.Civ.P. 8 ...........................122
 B. Conrail's Cross-motion for Judgment on the Pleadings .........123
 C. Summary Judgment Motions on the Merits–CERCLA Claims.....124
 1. Conrail ...................................................124
 2. APU ......................................................127
 3. King ......................................................128
 4. USX ......................................................128
 5. Chevron ..................................................130
 a. Chevron as Current Owner of Area 3 ...............130
 b. Chevron as Former Owner/Operator or Arranger/Transporter of Area 4 ...................................................133
 c. Rensselaer Defendants .............................134
 6. Portec.....................................................135
 D. Summary Judgment Motions on the Merits–Remaining Claims ..............137
 1. N.Y. Navigation Law Claims ..............................137
 2. Other State Law Claims ...................................137

V. CONCLUSION .................................................138

## I. *INTRODUCTION*

Plaintiff Niagara Mohawk Power Corporation ("NiaMo" or "plaintiff")[1] brought this action by complaint filed on July 1, 1998, pursuant to the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601–75, ("CERCLA") seeking to recover costs that it has incurred and will incur in remediating hazardous substances present at the Troy Water Street Site in Troy, New York ("Water Street Site"). Plaintiff filed an amended complaint on May 26, 1999, with leave of court.

In addition to its CERCLA claims, NiaMo invokes the supplemental jurisdiction of the court pursuant to 28 U.S.C. § 1367 over New York Navigation and Civil Practice Law claims as well as common law indemnification, unjust enrichment, and public nuisance claims. Each defendant has answered the complaint denying the material allegations and bringing counterclaims against NiaMo and cross-claims against each other defendant for indemnification and/or contribution for any liability incurred above and beyond that defendant's proportionate share. In addition,

---

[1]. A list of all abbreviations used throughout are found *infra* at 109.

defendant Chevron U.S.A., Inc. ("Chevron") brought a third-party action against the County of Rensselaer and the County of Rensselaer Sewer District No. 1 ("Rensselaer defendants") alleging claims pursuant to CERCLA, federal common law, and state law for indemnification and/or contribution for any liability incurred above and beyond its proportionate share. The Rensselaer defendants answered denying the allegations of the third-party complaint and bringing counterclaims against Chevron for indemnification and/or contribution for any liability incurred above and beyond their proportionate share.

As is typical in CERCLA actions, this litigation was bifurcated, with Phase I proceedings related to liability to be followed by Phase II proceedings regarding damages. The parties have filed various motions as detailed below. Oral argument was heard on April 24 and 25, 2002, in Utica, New York. Decision was reserved.

## II. BACKGROUND

### A. The NiaMo/DEC Consent Order

In December 1992 NiaMo and the New York State Department of Environmental Conservation ("DEC") entered into an Order on Consent ("Consent Order") requiring NiaMo to investigate the nature and extent of hazardous substances present at twenty-one former manufactured gas plant ("MGP") sites across the state, develop plans for remediation, and implement the remediation plan as directed by DEC. The purpose of the Consent Order was to "control and/or remove residual MGP waste sources" at the former MGP sites. (Capra Aff. Ex. D at NMPC100003 ¶ 5.) The Consent Order provided that NiaMo would develop and implement, for each site, a Preliminary Site Assessment ("PSA"), that

would permit DEC to determine which hazardous substances present posed a significant threat to the public health or the environment, thus necessitating remediation. The Consent Order further requires NiaMo to develop and implement a Remedial Investigation and prepare a Feasibility Study for any site found through the PSA to require more comprehensive evaluations. NiaMo must then remediate to the DEC's satisfaction each site found to be in need of remediation.

The Water Street Site, which is at issue in this litigation, was divided into four parts that were treated separately for the purposes of assessment, reporting, and remediation. (See Troy Water Street Site Map, infra at 110.)

Area 1 runs along the western shore of the Hudson River.[2] It is bordered on the south by the village of Menands and on the west by the Interstate Highway 787 ("I–787"). The I–787 interchange with the Troy–Menands Bridge is on the southern part of Area 1. It was previously the site of an ironworks as well as a coke plant. Area 1 covers approximately 111 acres. NiaMo has performed some removal of discrete areas of visible tar on Area 1 and continues to monitor it for signs of visible tar weeps. NiaMo concluded in its PSA/Interim Remedial Measures Study that no remedial investigation or feasibility study should be done because there was no source area of polynuclear aromatic hydrocarbons ("PAHs") or significant concentration of MGP-related by-products present. (Pl's. Ex. 1 at R–NMPC 00390.) No Record of Decision finalizing a remedy has been issued.

Area 2 covers approximately 33 acres along the eastern shore of the Hudson River. It is bordered on the west by

---

**2.** Although it was formerly known as Breaker Island, Area 1 has not been an island since the west branch of the Hudson River was filled in for highway construction.

approximately 1,200 shoreline feet, on the east by railroad tracks, and on the south by Area 3. The Wynantskill Creek runs from east to west across the northern part of area 2. Area 2 has been the site of a steel manufacturing plant, a manufactured gas plant, a petroleum distribution facility, and various commercial uses (such as parking of buses and refuse container storage). Contamination found includes PAHs (surface soil and groundwater), volatile organic compounds ("VOCs") (subsurface soils and groundwater), semivolatile organic compounds ("SVOCs") (surface and subsurface soils), and metals (surface soil). (Capra Aff. Ex. J at R–NMPC 005631–32.) Sediment samples from the Wynantskill Creek with high PAH levels were upgradient from Area 2, indicating that the source was upstream rather than Area 2 and that further investigations of the stream were unnecessary. *Id.* at R–NMPC 005633. NiaMo issued its Final Feasibility Study Report presenting an evaluation of remedial alternatives for Area 2 on June 15, 2001. (Capra Aff. Ex. J.) The DEC has not issued a Record of Decision selecting the remedy.

Area 3 is bordered on the north by Area 2, on the west by the Hudson River, on the east by the railroad tracks, and on the south by Area 4. Area 3, covering 11 acres, is positioned under the Troy–Menands Bridge. An asphalt terminal was previously operated on Area 3. The only MGP-related activity that occurred on Area 3 was coal storage. Therefore, NiaMo requested that Area 3 be deleted from the remediation plan. (Higgins Aff. Ex. FF.) DEC agreed to postpone, rather than delete, any investigation of Area 3 after expressing concern regarding possible MGP-related contamination in the Hudson River sediment adjacent to Area 3. *Id.*

Area 4 is bordered on the north by Area 3, on the west by the Hudson River, and on the east by the railroad tracks. It comprises 9 acres. Area 4 has been subdivided into operable unit 1, the land portion; and operable unit 2, the Hudson River sediments along Areas 2, 3, and 4. Area 4 had no industrial uses except manufactured gas plant waste disposal. Contamination found in the soil and sediments includes VOCs (specifically benzene, toluene, ethylbenzene and xylenes, or "BTEX"), and semivolatile organic compounds ("SVOCs") (specifically PAHs). (Capra Aff. Ex. F at NMPC 127475–76.) The largest contributor to human health risk was identified as carcinogenic PAHs associated with the tar lagoons. (Pl.'s Ex. 3 NMPC 004101.) Hazardous substances dismissed as contaminants of concern are: VOCs other than BTEX, PCBs, pesticides, metals (other than arsenic, mercury and lead found coincident with PAH contamination at the tar disposal sites), and cyanide (other than in areas of visual tar). (Capra Aff. Ex. F. at NMPC 127476.) The remediation plan for Area 4, Operable Unit 1 was selected by Record of Decision dated November 2000. The remedy includes excavating about 19,000 cubic yards of tar, treating or disposing of contaminated soils off-site, placing an impermeable cap over the area, implementing deed restrictions, and monitoring in the future. (Capra Aff. Ex. F at NMPC 127469.) Remediation will also include removal of visual tar in peripheral areas. (Capra Aff. Ex. F. at NMPC 127482.) A remedy has not yet been advanced for Operable Unit 2. *Id.* at NMPC 127473.

## B. *Water Street Site and the Parties*

The Water Street Site has historically been the site of industrial activity. In the middle 1800's a steam mill and a Bessemer Steel Works were operated there. By 1867 output from the steel works was five tons per day. In the late 1800's coal gas from coking ovens was produced for use in

the forges and steel furnaces. Manufacturing activities prior to 1902 are not at issue in this action.

Defendant United States Steel ("USX") or its predecessors owned the Water Street Site from 1902 to 1922. It operated iron and steel manufacturing facilities at Areas 1 and 2. It also dismantled some dilapidated buildings on Area 2 and an ironworks on Area 1 that had ceased operations in 1897.

NiaMo (or its predecessors) purchased the Water Street Site in 1922. It operated a manufactured gas plant, coke plant, and blast furnace on Areas 1 and 2 of the Water Street Site since about 1925. By 1927 NiaMo had 106 operational coke ovens there. Additional capacity was added over the years. As the manufactured gas operation is of primary interest in this matter, it will be described in more detail below. The coke plant and blast furnace produced for sale coke, creosote oil, hard pitch, tar, sulphate, benzol, phenol, pig iron, and manufactured gas. Any unsold hard pitch was burned on the site. There was also a tar distillation process that produced and sold gas oil. Coal tar was also a by-product of the manufactured gas plant operation but it had no commercial use. Also unusable for commercial purposes was purifier box waste.

In about 1930 NiaMo completed moving the Wynantskill Creek from a northwesterly running channel to a directly westerly path. Coal tar was used to fill the old channel. Additionally, coal tar was moved by truck or rail to Area 4 to be dumped into waste disposal pits. The pits were 75 to 100 feet long, 25 feet wide, and 10 to 12 feet deep.

In 1935 New York State appropriated about 3.5 acres of Area 1 for reconstruction of the Troy–Menands bridge. In 1940 the blast furnace and water gas and coke rights were sold to Republic Steel Corporation ("Republic Steel"). The blast furnace remained operational until 1969.

In 1951, NiaMo sold the coke plant to Republic Steel. Republic Steel operated the coke plant until 1955. In 1960 Republic Steel scrapped the coke ovens and breaker house. Reportedly Republic Steel covered one of the tar pits on Area 4 with soil and slag after it caught fire sometime around 1960.

In 1957 defendant King Service, Inc. ("King")[3] began operating a petroleum distribution facility on Area 2. King purchased most of Area 2 in 1968. NiaMo retained a very small piece of the property where the Wynantskill Creek enters the Hudson River for a gas regulator station. King demolished the coke plant and used the bricks as fill in various places in Area 2. King presently owns Area 2.

In 1955 Chevron purchased Areas 3 and 4. At that time it also leased a right-of-way for above-ground pipelines from Area 3 running north across Area 2 in the vicinity of the Hudson River shoreline to a barge dock. Chevron operated an asphalt terminal on Area 3.

In 1974 Chevron sold Area 4 to the Rensselaer defendants, who currently own it. Chevron currently owns Area 3.

Also associated with the Water Street Site are two additional parcels of real property. The railroad tracks at the eastern border of Areas 2, 3, and 4 are located upon a narrow strip of land that was owned or leased by defendant American Premier Underwriters ("APU") or its pre-

---

**3.** Individual defendants Edwin King, Lawrence King, and Richard Slote were officers of King Service, Inc. For simplification, this opinion will refer to King as the corporation and these individual defendants collectively.

decessors. This parcel is referenced as the "Railway Property." The Railway Property is now owned by defendant Consolidated Rail Corporation ("Conrail"). A railroad has been operated along this property since approximately 1845. Coal tar from a disposal pit on Area 4 has migrated to an access road on the Railway Property. The tar weep on the access road is addressed by the remediation plan for Area 4. (Capra Aff. Ex. F. at NMPC 127482.)

The second parcel of interest is referenced as the "Portec Property." The Portec Property was the site of a rail splicing plant operated by defendant Portec, Inc. ("Portec") from 1900 to 1989. Portec owned the property from 1968 to 1997. The railroad tracks that form the eastern border of Area 2 form the western border of the Portec Property. In other words, if the narrow Railway Property were not there, Area 2 and the Portec Property would be adjacent. Further, the Wynantskill Creek runs through the northern portion of the Portec Property, before it crosses Area 2 and empties into the Hudson River.

### C. *Manufactured Gas Plant Operation*

The following non-technical description [4] of the operation of a manufactured gas plant is provided as background to enable a better understanding of the nature of the contamination at the Water Street Site. The background may also shed light on the relationship among the parties and between the parties and the contamination.

To manufacture gas, bituminous, or soft, coal is heated to redness in an enclosed space from which the air has been removed. The process of cooking the coal in this manner is called coking. The temper-

ature in the coking ovens can reach 2500 F. and the process takes from 14 to 24 hours. Coking transforms the coal into coke, gas, tar, light oil and ammonia. Gas is collected and cooled in the gas handling system during the process. The gas is cooled by passing between boards over which cooling water trickles in a cooling tank. Tar fog condenses out of the gas as it cools, and tar falls to the bottom of the tank.

The manufactured gas is then purified by forcing the gas through oxide boxes that contain wood chips imbedded with iron. The iron removes contaminants such as cyanide, sulfur, and any remaining coal tar. Occasionally wood chips are "aired out" so that they can be reused. Eventually, however, the iron-imbedded wood chips become ineffective at removing contaminants and they would be disposed of by burning or use as fill.

When the process is complete, the coke, still red-hot, is "quenched" by pouring water on it in order to cool it enough so that it does not damage the conveyor belts used for transport, but not so much that it is cool enough to absorb water. The coke is then crushed and separated by size for different uses. For example, the largest size is used in blast furnaces and gas plants, while the medium sizes are used for domestic purposes. This process produces a lower British Thermal Unit ("BTU") gas, which was used to heat the coking plant as well as be sold.

In order to produce a higher BTU gas, water is added to coke during the heating process to produce water gas. The gas is collected and cooled, and the coke is quenched, in the same manner as described above. The higher BTU water gas

---

**4.** (*See generally* Higgins Aff. Ex. H (Lilley Dep.) (describing manufactured gas plant op- erations).)

was sold as is or mixed with the lower BTU gas in order to provide gas of standard heating power to customers.

Byproducts of the gas manufacturing process include heavy oils; light oils; coal tar; ash; clinker (pieces of unburned coal); oil/tar sludges; and ammonia, cyanide, and sulfur salts. Coal tar and the sludges contain a high concentration of PAHs. Coal tar has been found in or on Area 1, Area 2, Area 4, Hudson River sediments adjacent to Area 4, and the Railway Property adjacent to Area 4.

Oxide box by-products including free sulfur, ferrocyanide, thiocyanate, and napthalene also resulted from the gas manufacturing process. Oxide box wastes have been found in Area 2.

Typical hazardous contamination found at MGP sites includes coal tar, ash, clinker, phenol, benzene, sulfur products, and cyanide. The principle hazardous substance associated with coal tar deposits is PAH contamination of the soil.

### D. *Theories of CERCLA Liability*

#### 1. *Conrail*

NiaMo seeks to hold Conrail liable as a current owner pursuant to 42 U.S.C. § 9607(a)(1). Conrail is the current owner and operator of the Railway Property. NiaMo contends that the Railway Property is contaminated with coal tar and PAHs and therefore Conrail must be held strictly liable as the owner. NiaMo also asserts that Conrail released hazardous substances when it relocated tracks in the vicinity of the tar weep adjacent to Area 4. Conrail asserts the innocent owner affirmative defense.

#### 2. *APU*

NiaMo seeks to hold APU liable as the owner and/or operator of property at the time of a disposal of hazardous waste. *See* 42 U.S.C. § 9607(a)(2). The basis for this theory of liability is that APU owned the Railway Property at the time when by products of railroad operations were released constituting a disposal of hazardous substances. NiaMo also contends that APU relocated tracks in the vicinity of the coal tar lagoons on Area 4, thereby releasing coal tar, a hazardous substance.

#### 3. *King*

NiaMo seeks to hold King liable as current owner/operator pursuant to 42 U.S.C. § 9607(a)(1). NiaMo further alleges that King is not entitled to assert the petroleum exclusion set forth in 42 U.S.C. § 9601(14). King is the current owner and operator of Area 2. NiaMo alleges that when King demolished the former coke ovens and used the brick as fill it released hazardous substances into Area 2. King asserts the innocent owner defense and the petroleum exclusion to this claim. NiaMo also seeks to hold King liable as an arranger for the use of the coke oven bricks as fill and for storing leaking drums.

#### 4. *USX*

NiaMo seeks to hold USX liable as the owner and/or operator of property at the time of a disposal of hazardous waste and as an arranger. *See* 42 U.S.C. § 9607(a)(2)-(3). NiaMo contends that USX is liable under this theory because it demolished buildings on Area 2 and dismantled an ironworks on Area 1, releasing hazardous waste. NiaMo also contends that a release of hazardous substances occurred on Area 4 during USX's ownership as demonstrated by an increase in acreage of Area 4 during the time of USX's ownership. The alleged basis for liability as an arranger again is the demolition and dismantling of buildings.

### 5. *Chevron*

NiaMo seeks to hold Chevron liable as current owner/operator pursuant to 42 U.S.C. § 9607(a)(1). NiaMo further alleges that Chevron is not entitled to assert the petroleum exclusion set forth in 42 U.S.C. § 9601(14). Chevron is the current owner of Area 3, which NiaMo argues is part of the Water Street Site which is contaminated with hazardous substances. NiaMo contends that Chevron is liable as the current owner of an easement over Area 2 in the vicinity of the pipeline.

NiaMo also seeks to hold Chevron liable as a former owner/operator based upon (1) its operation of the pipeline, and (2) it permitting its lessee Republic Steel to cover the coal tar lagoons on Area 4 while Chevron owned the property. Chevron asserts the petroleum exclusion on both claims of current and former owner/operator.

Finally, NiaMo seeks to hold Chevron liable as an arranger pursuant to 42 U.S.C. § 9607(a)(3). NiaMo contends arranger liability based upon Chevron permitting Republic Steel to cover the Area 4 tar pits.

### 6. *Portec*

NiaMo seeks to hold Portec liable as the owner and/or operator of property at the time of a disposal of hazardous waste and as an arranger. *See* 42 U.S.C. § 9607(a)(2)-(3). NiaMo contends that Portec, as leader of the Wynantskill Improvement Association, "operated" a portion of Area 2 by virtue of its control of the flow of water of the Wynantskill Creek from the early 1900s to 1997, during the time that hazardous releases occurred. NiaMo also contends that Portec allowed disposal of hazardous substances on its property, facilitating the transport of the hazardous waste into the Wynantskill Creek, Area 2, and the Hudson River.

### 7. *Rensselaer Defendants*

Chevron asserts liability on the part of the Rensselaer defendants because they are the current owners of Area 4, upon which hazardous substances are located. *See* 42 U.S.C. § 9607(a), 9613(f)(1). Chevron also asserts liability based upon federal common law and state law.

### 8. *Counterclaims and Cross-claims*

As noted above, all defendants brought counterclaims against NiaMo and cross-claims against each other defendant for indemnification and/or contribution for any liability incurred above and beyond that defendant's proportionate share. *See* 42 U.S.C. § 9613(f)(1). The basis for the counterclaims and cross-claims is that when equitable factors are considered, response costs should be allocated among the liable parties and each party should only be responsible for its proportionate share.

### E. *State Law Theories of Liability*

NiaMo brings claims against all defendants pursuant to New York Navigation Law § 181(1), (5), which provides for strict, joint and several, liability for any petroleum discharge. NiaMo also brings claims for contribution for clean up costs against all defendants pursuant to New York Navigation Law § 176(8). NiaMo asserts claims against all defendants for contribution from joint tortfeasors pursuant to New York C.P.L.R. § 1401, indemnification pursuant to New York common law, public nuisance, and for a declaration that all defendants are liable for past and future response costs. Finally, NiaMo brings claims for unjust enrichment against King and Chevron, asserting that they have an obligation to clean up their property and have been unjustly enriched by not doing so.

Chevron brings counterclaims and cross-claims for any contamination to Area 3 based upon New York Navigation Law, negligence, trespass, nuisance, and federal common law, against NiaMo and the other defendants. Chevron also alleges that NiaMo caused the MGP-related hazardous contamination and should be responsible for the damage to its land.

## III. LEGAL STANDARDS

### A. Motion to Dismiss

A cause of action shall not be dismissed for failure to state a claim under Fed. R.Civ.P. 12(b)(6), "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering a motion brought pursuant to Fed.R.Civ.P. 12(b), the court must assume all of the allegations in the complaint are true. *Id.* In reviewing the sufficiency of a complaint at the pleading stage, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

Where a motion to dismiss is made prior to any discovery or the filing of an answer, the court is loath to dismiss the complaint, regardless of whether the plaintiff is unlikely to prevail, unless the defendant can demonstrate that plaintiff is unable to prove facts which would entitle him to relief. *Wade v. Johnson Controls, Inc.*, 693 F.2d 19, 22 (2d Cir.1982); *see also Egelston v. State Univ. College at Geneseo*, 535 F.2d 752, 754 (2d Cir.1976).

### B. Summary Judgment

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 436 (2d Cir.1999). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Richardson*, 180 F.3d at 436; *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983). Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. 2505; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348. At that point the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348.

### C. Expert Testimony

Expert testimony is appropriate where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. A witness may qualify as an expert by

knowledge, skill, experience, training, or education. *Id.* Expert testimony must be relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594–95, 113 S.Ct. 2786, 2797, 125 L.Ed.2d 469 (1993); *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir.2002); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir.1995). Such testimony must be "based upon sufficient facts or data, . . . [be] the product of reliable principles and methods, . . . and the witness [must have] applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702.

Factors that may be considered in assessing the reliability and relevance of the expert testimony are whether the theory has been or could be tested, whether it has been subjected to peer review and publication, and whether the theory enjoys general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 593–94, 113 S.Ct. at 2796–97; *Amorgianos*, 303 F.3d at 266; *McCullock*, 61 F.3d at 1042. Neither peer review and publication nor general acceptance are dispositive in the reliability assessment. *Daubert*, 509 U.S. at 593–94, 113 S.Ct. at 2796–97. Moreover, extensive practical experience may provide the basis for an expert opinion. *McCullock*, 61 F.3d at 1043. The inquiry must be flexible, focusing "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595, 113 S.Ct. at 2797; *Amorgianos*, 303 F.3d at 266. The reliability and relevance assessment is applicable to technical and other specialized knowledge, as well as scientific knowledge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999).

### D. *CERCLA*

CERCLA section 9607 imposes strict liability upon "covered persons." 42 U.S.C.A. § 9607(a) (West 1995). A covered person, also known as a potentially responsible person ("PRP"), may fall within one or more of four groups: the owner and operator of a facility; "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of;" and "any person who . . . arranged for disposal or treatment, or arranged for transport for disposal or treatment, of hazardous substances owned or possessed by such person;" and "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities . . . from which there is a release, or a threatened release which causes the incurrence of response costs." *Id.; United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 184 (2d Cir.2003). Response costs can be recovered if "(1) there was a release or threatened release, which (2) caused incurrence of response costs, and (3) . . . . the defendant generated hazardous waste at the clean-up site." *Alcan Aluminum*, 315 F.3d at 184. No showing that "a specific defendant's waste caused the incurrence of cleanup costs" is required in order to impose strict liability. *Id.*

A defendant PRP in a direct action to recover response costs under § 9607 is jointly and severally liable for response costs unless it falls within a special exception or it establishes divisibility of harm. *Id.* at 185. The special exception permits a defendant to escape liability entirely if it proves that "its pollutants did not contribute more than background contamination and also cannot concentrate." *Id.* If a defendant does not qualify for the special exception, it may establish that it "contributed at most to only a divisible portion of the harm." *Id.* The defendant bears the burden of establishing divisibility of harm.

*Id.* It may do so by introducing evidence such as " 'relative toxicity, migratory potential, and synergistic capacities of the hazardous substances at the site.' " *Id.* (quoting *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 722 (2d Cir. 1993)).

Section 9607 also provides for affirmative defenses to liability. An otherwise responsible person is not liable if it is established that the release or threat of release of a hazardous substance and the resultant damages were caused solely by an act of God or an act of war. 42 U.S.C. § 9607(b)(1)-(2). Liability can also be avoided upon proof that the release or threatened release and resultant damages were caused by a third party, where the third party is not an employee or agent, nor did the release or threatened release occur in connection with a contractual relationship with the otherwise responsible person. *Id.* § 9607(b)(3). In order to succeed with the third-party defense, the defendant must establish that

> (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions.

*Id.* § 9607(b)(3).

■ A PRP who is not entitled to a statutory defense cannot bring a direct cost recovery action pursuant to § 9607 against other PRPs. *Bedford Affiliates v. Sills*, 156 F.3d 416, 425 (2d Cir.1998). Rather, such a PRP may only recover from other PRPs via a contribution action pursuant to § 9613. *Id.*

■ Section 9613 provides that liable or potentially liable persons may seek contribution from any other person who is liable or potentially liable under § 9607(a). 42 U.S.C. § 9613(1). A prima facie contribution case under § 9613 has the same elements as a prima facie case for cost recovery under § 9607. *Bedford Affiliates*, 156 F.3d at 427. Thus, the elements of a prima facie case are (1) the defendant is a covered person as defined by § 9607, (2) the site is a facility as defined by CERCLA, (3) there is a release or threatened release of hazardous substances at the facility, (4) costs were incurred in response, and (5) the costs and response were consistent with the National Contingency Plan ("NCP"). *Id.* at 427.

■ In resolving contribution claims, the court allocates response costs among liable parties using such equitable factors as the court determines are appropriate. 42 U.S.C. § 9613(f)(1). Thus, in an action for contribution the court determines the proportionate share of responsibility of each PRP to determine the percentage of the total damages for which each PRP is liable.

■ Contribution is not available from a party "who has resolved its liability to the United States or a State in an administrative or judicially approved settlement." *Id.* § 9613(f)(2). This contribution protection applies to matters addressed in the settlement. *Id.* Such a settlement does not affect the liability of others, but it does reduce "the potential liability of the others by the amount of the settlement." *Id.* Thus, when a PRP settles with the government, the settlement amount is deducted from the total response costs and the remainder is divided proportionally among the non-settling PRPs.

## IV. ANALYSIS

### A. NiaMo's Motion to Dismiss Counterclaims

#### 1. CERCLA Contribution Protection

 NiaMo moves to dismiss all defendants' counterclaims for contribution, contending that it is entitled to contribution protection under CERCLA, § 9613(f)(2). Each defendant opposes contending that NiaMo is not entitled to contribution protection for various reasons.

Defendants' strongest argument against contribution protection is that due process requires notice and an opportunity to be heard before denying a PRP contribution from another PRP. Here, defendants were not notified that they were considered PRPs, were not notified that NiaMo was negotiating with DEC regarding remediation at the Water Street Site, were not involved in settlement discussions, and were not given the opportunity to also settle with the DEC. Thus, they argue, contribution protection for NiaMo would result in an unconstitutional taking (of their right to contribution) in violation of the Fifth Amendment.

There is some case law in support of this argument. In *General Time Corp. v. Bulk Materials, Inc.*, 826 F.Supp. 471 (M.D.Ga. 1993), the court found that the "right of contribution is a property interest, which cannot be extinguished without procedural due process of law." *Id.* at 477. The court reasoned that since the non-settling PRP was not given notice or an opportunity to be heard, the settling PRP was not entitled to contribution protection. *Id.* at 478; *see also, American Special Risk Ins.*

*Co. v. City of Centerline*, 180 F.Supp.2d 903, 910 (E.D.Mich.2001) (expressing due process concerns but not deciding on constitutional grounds because the current claims were not "matters addressed" in the purported settlement agreement); *Kelley v. Wagner*, 930 F.Supp. 293, 298 (E.D.Mich.1996) (finding due process satisfied where the consent decree was submitted to the court for approval and the non-settling PRP was a defendant in the case).

This apparent question of first impression need not be reached in this case. In this contribution action any counterclaims for contribution are superfluous and thus the issue of contribution protection is moot.

NiaMo essentially admitted liability for the response costs at the Water Street Site by entering into the Consent Order. Accordingly, NiaMo is a covered person, or PRP, under § 9607. Thus, NiaMo is precluded from bringing a direct cost recovery action against the defendants. *See Bedford Affiliates*, 156 F.3d at 425. It is limited to bringing a contribution action pursuant to § 9613, as it did. *See id.* As noted, in an action for contribution first it must be determined whether a defendant is a responsible person under § 9607. *Id.* at 427. If the other elements of a prima facie case are established (facility, release, costs incurred, and NCP conformance), *see id.*, then the court determines the proportional share for which each responsible person, including NiaMo, is liable. Each defendant, and in this case, the plaintiff, is assigned a proportionate share of liability for the total response costs at the facility. *See* 42 U.S.C. § 9613.[5]

---

5. The importance of contribution in the ordinary case illustrates the point being made. The framework normally is that the state or federal government brings suit against multiple defendants (PRPs). If liability is established against all defendants, they are jointly and severally liable. In the damages phase, the contribution cross-claims among the defendants are determined by allocating proportional shares, but joint and several liability still applies.

Thus, by the very nature of a contribution action, counterclaims for contribution are superfluous. All defendants' counterclaims for contribution pursuant to CERCLA must be dismissed.

### 2. *Failure to State a Claim*

■ NiaMo further contends that counterclaims brought pursuant to New York Navigation Law should be dismissed for failure to state a claim. Conrail, King, Chevron, and Portec argue that the Navigation Law counterclaims state causes of action. Section 181 of the New York Navigation Law imposes strict liability "for all cleanup and removal costs and all direct and indirect damages" upon anyone who discharged petroleum. N.Y. Nav. L. § 181(1) (McKinney Supp.2003). A party held liable under the provisions of the New York law may bring a claim against another party who actually caused or contributed to the discharge. *White v. Long*, 85 N.Y.2d 564, 569–70, 626 N.Y.S.2d 989, 650 N.E.2d 836 (N.Y.Ct.App.1995).

Here, defendants bring claims against NiaMo alleging they are entitled to contribution from NiaMo for the removal costs of the petroleum it discharged on their property. Taking the allegations as true, these defendants could be entitled to relief. NiaMo has not shown that there are no sets of facts which, if proven, would entitle

defendants to relief. *See Wade*, 693 F.2d at 22. Thus, the counterclaims brought pursuant to the Navigation Law will not be dismissed.

Chevron cross moves in the alternative to amend its complaint, in the event it is determined that the counterclaims fail to state a cause of action. Given the determination that the counterclaims state a cause of action, this cross motion is moot.

### 3. *Compliance with Fed.R.Civ.P. 8*

■ Finally, NiaMo argues that the state and federal common law counterclaims (brought by Conrail, King, Chevron, and Portec) and N.Y. C.P.L.R. § 1401 counterclaims (brought by APU) should be dismissed as lacking specificity, for failure to comply with Fed.R.Civ.P. 8. Defendants argue that these counterclaims are sufficiently specific and comply with notice pleading requirements.

Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir.1988). The purpose of this requirement "is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial." *Id.* Defendants' counterclaims assert their entitlement to contribution from NiaMo for any amount greater than their proportionate share of

---

If a defendant settles the claim against it, joint and several liability is no longer an issue thanks to contribution protection. The settling defendant now is protected from claims for contribution from other defendants should, in the damages phase, its proportionate share of liability be determined to be greater than the settlement amount. Additionally, where there are unidentified, defunct, and bankrupt PRPs, any defendants found liable are responsible for their allocated proportion of the total damages (after the contribution determination; however, they are still jointly and severally liable for the entire amount), including the so-called "or-

phan shares." This is important to the settling defendant because only the non-settling defendants will be liable for the orphan shares.

This ordinary case contrasts sharply with the circumstances of the instant case. Here there was no direct cost recovery action, so there is no joint and several liability. Rather, the action is one for contribution, and each defendant found to be liable will only be liable for its proportionate share (including a portion of any orphan shares). No defendant in this case will be jointly and severally liable for the total damages.

response costs at the Water Street Site. The counterclaims provide NiaMo with sufficient notice of the claim asserted, and NiaMo has answered the counterclaims. *See id.* Accordingly, the counterclaims will not be dismissed for lack of specificity.

### B. *Conrail's Cross-motion for Judgment on the Pleadings*

■ Conrail moves to dismiss NiaMo's claim for contribution pursuant to § 9613. Relying upon a case from the United States Court of Appeals for the Fifth Circuit, Conrail argues that since NiaMo was never subject to a current or past CERCLA enforcement action it is statutorily precluded from bringing a contribution claim. *See Aviall Servs., Inc. v. Cooper Indus., Inc.,* 263 F.3d 134 (5th Cir.2001) (*"Aviall I"*), *reversed,* 312 F.3d 677 (5th Cir.2002) (en banc) (*"Aviall II"*).[6]

Conrail's argument and the *Aviall I* Court's rationale were based upon the text of CERCLA, which provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, *during or following any civil action under section 9606 of this title or under section 9607(a) of this title."* 42 U.S.C. § 9613(f)(1) (emphasis added); *see Aviall I,* 263 F.3d at 138. The reasoning is that the statutory text "during or following" any CERCLA action requires that a party seeking contribution must have been subject to a direct cost recovery action during or following the filing of the claim for contribution. *Aviall I,* 263 F.3d at 138. Additionally, the court determined that the savings clause of the provision, that "[n]othing in this subsection shall diminish the right of any person to bring an action

for contribution in the absence of a civil action under section[s] 9606" and 9607, applied only to state law actions for contribution. *Id.* at 139. The court reasoned that this interpretation was required in order to prevent "render[ing] superfluous the . . . enabling clause." *Id.; see also Aviall II,* 312 F.3d at 680 (explaining the panel decision).

The *en banc* court rejected the panel's determination, holding that a PRP may sue other PRPs for contribution at any time. *Aviall II,* 312 F.3d at 681. The court found that this interpretation is supported by "CERCLA's twin purposes [of] promot[ing] prompt and effective cleanup of hazardous waste sites and the sharing of financial responsibility among the parties whose actions created the hazards." *Id.* The court noted that prior to the addition of section 9613 to CERCLA, a federal common law permitting causes of action for contribution among PRPs had developed. *Id.* at 683. The common law causes of action for contribution were not dependent upon prior CERCLA cost recovery actions. *Id.* Section 9613 was promulgated "to give PRPs the 'explicit right to sue' for contribution and to 'confirm' the decisions of federal courts that had so construed CERCLA." *Id.* at 684 (quoting H.R.Rep. No. 99–253 pt. I, at 59, 79 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 2841, 2861; and citing S.Rep. No. 99–11, at 44 (1985)). Additionally, the court noted that its interpretation was supported by other federal court decisions. *Id.* at 682 & n. 7.

The *Aviall II* Court reached the correct conclusion, in light of the case law developed prior to passage of section 9613, the statutory language, and the legislative history. As that court stated, "[S]ound inter-

---

**6.** The Fifth Circuit's en banc ruling was made subsequent to the oral arguments in this matter. Conrail, the party relying on the earlier decision, notified the court and the parties the

day after the en banc ruling was rendered. Apparently a petition for certiorari has been filed with the United States Supreme Court.

pretation reconciles the text of a disputed provision with the structure of the law of which it is a part; may draw strength from the history of enactment of the provision; and acknowledges the legislature's general policies so that the interpretation does not become absurd." *Id.* at 680. Given this backdrop, it must be concluded that a PRP may bring a contribution action at any time, without regard to whether it has been or is subject to a direct cost recovery action. *See id.* at 681; *1325 "G" Street Assocs., LP v. Rockwood Pigments NA, Inc.,* 235 F.Supp.2d 458, 464 (D.Md.2002) (agreeing with the *Aviall II* Court); *Ninth Ave. Remedial Group v. Allis Chalmers Corp.,* 974 F.Supp. 684, 691 (N.D.Ind.1997) (finding that a PRP can bring a contribution claim although there is or has been no cost recovery action against it); *Johnson County Airport Comm'n v. Parsonitt Co.,* 916 F.Supp. 1090, 1095 (D.Kan.1996) (finding that contribution action can proceed in absence of action under sections 9606 or 9607); *Mathis v. Velsicol Chem. Corp.,* 786 F.Supp. 971, 975–76 (N.D.Ga.1991) (contribution action can proceed regardless of action brought pursuant to sections 9606 or 9607); *Alloy Briquetting Corp. v. Niagara Vest, Inc.,* 756 F.Supp. 713, 718 (W.D.N.Y.1991); *see also Geraghty & Miller, Inc. v. Conoco, Inc.,* 234 F.3d 917, 924–25 (5th Cir.2000) (implicitly recognizing that a contribution action can proceed without a cost recovery action by stating that where "there has been no prior section 107 cost-recovery action, a contribution action ... must be brought within" the appropriate limitations period), *cert. denied,* 533 U.S. 950, 121 S.Ct. 2592, 150 L.Ed.2d 751 (2001); *Sun Co. v. Browning–Ferris, Inc.,* 124 F.3d 1187, 1192–93 (10th Cir.1997) (discussing statute of limitations differences for contribution actions where plaintiff was subject to direct cost recovery action and where plaintiff incurred response costs in some other manner);

*Coastline Terminals of Connecticut, Inc. v. USX Corp.,* 156 F.Supp.2d 203, 208 (D.Conn.2001) (rejecting defendant's argument that contribution claim precluded because plaintiff was not subject to a 9606 or 9607 claim; relying upon *Bedford Affiliates,* 156 F.3d at 424, to find that plaintiff could assert a contribution claim although precluded from bringing a direct cost recovery claim). Therefore, Conrail's motion for judgment on the pleadings must be denied.

### C. *Summary Judgment Motions on the Merits—CERCLA Claims*

#### 1. *Conrail*

■ The issue with respect to Conrail is whether the Railway Property is a "facility" making Conrail, as a current owner/operator, a responsible person under CERCLA. A facility is

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9). It is undisputed that the Railway Property contains coal tar that migrated there from Area 4, and that coal tar is a hazardous substance. Thus, the Railway Property is a place where a hazardous substance (coal tar) has come to be located, and by definition Conrail could be considered the owner of a facility. However, the "facility" for which NiaMo seeks contribution for response costs is the former manufactured gas plant facility, including the coal tar disposal lagoons locat-

ed in Area 4 adjacent to the Railway Property.

NiaMo attempts to redefine the MGP facility to include the Railway Property. Separate parcels should be considered as a single facility if they " 'cannot be reasonably or naturally divided into multiple parts or functional units.' " *United States v. 150 Acres of Land,* 204 F.3d 698, 709 (6th Cir.2000) (quoting *United States v. Township of Brighton,* 153 F.3d 307, 313 (6th Cir.1998)). Similarly, where parcels are naturally divisible into parts or functional units, they should not be considered as a single facility. *Cf. id.*

The Railway Property and the property upon which the MGP operated have not shared an owner since at least 1845. There is no evidence that they have ever been under common control. The Railway Property is a narrow parcel upon which a railroad has been operated for over 100 years. This parcel was never operated in conjunction with the MGP operations.

It is undisputed that the areas of hazardous substances on the Railway Property that NiaMo is required to remediate are areas of coal tar that had migrated from the disposal lagoons to the adjacent property. The Consent Order contemplated that NiaMo would be responsible for remediation of off-site contamination that resulted from disposal of hazardous MGP wastes. (*See* Capra Aff. Ex. D at NMPC100020 ¶ XVII(A)). Off site occurrences of hazardous substances that were derived or otherwise related to MGP wastes on the site were "(deemed subject to [the Consent Order] to the extent [NiaMo] is able to obtain access for purposes of investigation and/or removal)." *Id.* at NMPC100008 ¶ III(B)(2)(I)(*b*). Further, the Record of Decision for Area 4 directs that "[p]eripheral areas of visual tar" on the Railway Property be excavated and the area backfilled with uncontaminated soil. *Id.* Ex. F at NMPC 127482. Thus, the DEC and NiaMo considered and treated the Railway Property as separate and distinct from the Water Street Site MGP facility.

Because the Railway Property is naturally divisible from the remainder of the Water Street Site, and, at least in the last 150 years has had no connection with the property upon which the MGP operated, NiaMo's current attempts to integrate the Railway Property into the Water Street Site in order to hold Conrail liable as a current owner must be rejected. *Cf. 150 Acres of Land,* 204 F.3d at 708–09 (finding a single facility where three parcels were commonly owned, investigated for contamination at the same time, transferred by the same deed, and were in the same undeveloped state).

Even if the contaminated portion of the Railway Property was considered part of the Water Street Site because of the source of the contamination, it would be untenable to hold Conrail liable as a current owner since the undisputed cause of the contamination was the MGP, and NiaMo has already accepted responsibility for remediation. *See New York v. Westwood–Squibb Pharm. Co.,* 138 F.Supp.2d 372, 382–83 (W.D.N.Y.2000) (finding that creek adjacent to former MGP property was part of same CERCLA facility because there was a common source of contamination, therefore holding the owner of the MGP property liable); *see also Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 178 (2d Cir.2003) (stating, "If a person merely controlled a site on which hazardous chemicals have spread without that person's fault, that person is not a polluter and is not one upon whom CERCLA aims to impose liability"); *City of Portland v. Boeing Co.,* 179 F.Supp.2d 1190, 1201 (D.Or.2001) (finding that where hazardous substances migrated from defen-

dant and other sources to plaintiff's property, plaintiff is not liable under § 9607; stating, "The fact that Plaintiff owns property contaminated by other sources does not make it a liable party"). As the *Boeing Co.* Court noted, it would be an irrational result if the owner of an adjacent, contaminated, property such as the Railway Property were designated part of the CERCLA facility, thus subjecting the owner to liability for *all* of the contamination at the entire facility, "absent any relationship to the party or its property." *See Boeing Co.*, 179 F.Supp.2d at 1201.

Furthermore, if the Railway Property were considered a separate facility because of the presence of the coal tar, Conrail would be entitled to the innocent owner defense, as the contamination migrated onto its property and there was no contractual relationship with NiaMo, the party causing the contamination.[7] *See Bedford Affiliates*, 156 F.3d at 425; § 9607(b)(3). In the event that Conrail incurred resulting response costs, it would be entitled to bring a direct cost recovery action against NiaMo pursuant to § 9607. *See Bedford Affiliates*, 156 F.3d at 425.

NiaMo argues that there is contamination elsewhere on the Railway Property unrelated to MGP operations, requiring Conrail to be held liable. However, as previously noted, it is only MGP-related contamination for which NiaMo is responsible. Contamination from other sources on property unrelated to NiaMo would not result in NiaMo incurring response costs, an element of a prima facie contribution claim. NiaMo contends that it has incurred investigatory costs on the Railway Property. However, there is no question of material fact regarding these costs-they were incurred due to the migration of coal

tar onto the adjacent property from Area 4. While NiaMo is correct that causation is irrelevant in this strict liability matter, it would be absurd to permit the party responsible for the release of hazardous substances to search adjacent property, onto which that responsible party's own contaminants have migrated, for some other, any other, trace of hazardous substance in order to hold that adjacent property owner liable as a "current owner" of a facility upon which hazardous substances are found. That is exactly what NiaMo is attempting here. It found trace amounts of what it alleges are hazardous substances released by historical locomotive operations on the Railway Property, and now attempts to hold Conrail liable for NiaMo's own contamination. To follow NiaMo's argument to its conclusion, if Conrail were held liable under this argument, then during apportionment it would certainly submit evidence that any locomotive-related substances were merely background amounts and required no remediation. Then, NiaMo would be apportioned the greatest liability (with respect to the Railway Property) because it indisputably caused the coal tar contamination. However, even if Conrail were found .05 percent liable, it would still be responsible for that proportionate share of any orphan shares, despite having no culpability. This result cannot be sustained.

The cases relied upon for this argument are inapposite because of the different relationship among the parties and the properties. For example, in *Westwood–Squibb Pharm. Co.* the current owner of a creek adjacent to a former MGP sued the current owner of the MGP property to recover for costs incurred in remediating contamination. 138 F.Supp.2d at 374. The

---

7. It is noted that there is an additional good faith element to this affirmative defense. *See* 42 U.S.C. § 9607(b)(3). Consideration of that element is unnecessary given the determination regarding the facility.

owner of the MGP property had been found liable for contamination on the 8.8 acre site. *Id.* However, it argued that because the MGP was operated prior to its ownership, the 8.8 acre site and the MGP were two different facilities for the purposes of CERCLA. The court rejected this argument (finding that there was one facility, including the 8.8 acres, the MGP, and the creek) and went on to note that a current owner's liability is strict, joint, and several. *Id.* at 381. Thus, the creek owner was not required to prove that the release of contaminated groundwater from the MGP facility contributed to its response costs in order to seek recovery from the MGP property's owner. *Id.* at 381–82. In the instant action, however, it is the former owner of the MGP property (NiaMo) seeking to recover from the adjacent landowner (Conrail), despite the fact that the contamination undoubtedly migrated from the MGP property.

*Clear Lake Props. v. Rockwell Int'l Corp.*, 959 F.Supp. 763 (S.D.Tex.1997), is similarly inapposite. In that case, a PRP lessee of land sued owners of adjacent properties claiming that the adjacent properties had contributed to the contamination on the land. *Id.* at 765. The operator of a laboratory, also a PRP, argued that the laboratory and the land/groundwater underneath it should be considered two separate facilities. *Id.* at 768. The court rejected this theory and found that the building and the land/groundwater were a single CERCLA facility. *Id.* This differs from the instant case in important respects. In *Clear Lake Props.* property was contaminated in part by hazardous substances in groundwater from the adjacent property. *Id.* at 765. Suit was brought by one PRP against other PRPs in order to recover response costs incurred for which the other PRPs were responsible. *Id.* The party seeking to avoid liability had released hazardous substances into the environment. *Id.* That party sought to sever a building from the ground on which it sat in order to avoid liability. *Id.* at 767–68.

In this case, the property was contaminated with coal tar from NiaMo's former operations. The contamination migrated to an adjacent property. NiaMo seeks to integrate the whole of the Railway Property, which has been completely separate property in all ways for over 150 years, into the MGP facility in order to obtain contribution from Conrail for contamination that it alone caused. This is not a case, as in *Clear Lake Props.*, where a landowner is seeking contribution from a polluter. Rather, NiaMo, the polluter, is seeking contribution from the very landowner whose property it polluted. Thus, while *Clear Lake Props.* supports the proposition that contaminated property should not be unnaturally divided, it is unhelpful to NiaMo's proposed unnatural integration of separate property.

No genuine issues of material fact exist as to the bounds of the CERCLA facility as it relates to the Railway Property. Conrail is entitled to judgment as a matter of law dismissing all contribution claims against it. Moreover, Conrail's cross-claims for contribution must be dismissed as moot and its motion for summary judgment on its cross-claims against APU must be denied as moot.

**2. *APU***

■ NiaMo's claims against APU are similarly based upon defining the Railway Property as part of the facility for which NiaMo is responsible for remediating. NiaMo again argues that APU historically operated locomotives through the Railway Property that released hazardous substances. Therefore, NiaMo argues, APU is liable as a former operator of a site

where hazardous substances were released. NiaMo's argument fails, as set forth with regard to Conrail.

Additionally, NiaMo contends that there was a release of hazardous substances when a track was relocated, some time prior to April 15, 1975. The only evidence NiaMo points to is the opinion of its expert that if a track was relocated where there was a tar weep, then it would "likely" result in movement of the tar. This is insufficient to create an issue of fact in the face of evidence from the same expert that the only evidence of tar on the Railway Property is south of the Area 4 lagoons, which is not where the track relocation occurred. Thus, there is no genuine issue of material fact as to contribution claims against APU and APU is entitled to judgment as a matter of law. Cross-claims for contribution by and against APU must also be dismissed as moot.

### 3. *King*

■ NiaMo seeks summary judgment against King as the current owner of Area 2 and as an arranger. King is the current owner of Area 2, the portion of the property where the MGP was located. There is undisputed evidence that MGP-related hazardous wastes are located on Area 2. Thus, King is liable as a current owner unless it can demonstrate entitlement to an affirmative defense.

King asserts that it is an innocent owner under § 9601(35)(B). King contends that it engaged in all appropriate inquiry when it purchased the property in 1968. However, it has adduced no evidence of any inquiry. Accordingly, it has not established entitlement to the innocent owner defense.

NiaMo has adduced evidence that King used coke oven bricks for fill, thus transporting and disposing of hazardous substances. King makes no argument regarding this issue.

The undisputed facts establish that King is liable both as a current owner and as an arranger. NiaMo is not entitled to summary judgment on these claims, however, because a genuine issue of fact remains for trial as to whether the response costs incurred by NiaMo are consistent with the NCP. *See Buffalo Color Corp. v. Alliedsignal, Inc.*, 139 F.Supp.2d 409, 417–18 (W.D.N.Y.2001) (finding it improper to grant summary judgment before it is determined whether any costs incurred were consistent with the NCP). Also remaining for trial is the allocation of damages relating to King.

### 4. *USX*

■ It is undisputed that USX owned portions of the Water Street Site until it was sold to NiaMo in 1922. NiaMo thereafter established its MGP operation, marking the advent of widespread contamination with MGP wastes. Accordingly, in order to establish USX's liability, NiaMo must demonstrate that a release or threatened release of hazardous substances occurred prior to the advent of the MGP. USX contends that there was no such release during its period of ownership.[8]

J. David Moniot ("Moniot"), USX's expert, opined that USX did not operate any production facilities at the Water Street Site and therefore did not generate or dispose of any waste materials there. (Murphy Aff. Ex. O at 1.) He further opined that USX did not own, operate or

8. NiaMo claims that USX is liable as an owner as well as an arranger. The basis for the arranger claim is that during demolition of an ironworks and buildings a release of hazard- ous substances occurred. This is also the basis for the owner claim. Therefore, both are considered together.

demolish any facilities on Areas 2 or 4 and therefore did not cause a release or disposal of hazardous substances there. *Id.* USX dismantled an ironworks on Area 1 prior to 1921. Moniot stated that a blast furnace would not contain PAHs or tar. *Id.* at 2. Further, he stated that no operation or demolition was conducted between 1902 and 1918 that would generate fill to expand the property of Area 4 as plaintiff suggests. He opined that it is common for equipment to be dismantled without releasing oils and greases, and that care would have been taken to do so. *Id.* at 3–4. Finally, he opined that "[c]ontrary to plaintiff's supposition, there is no evidence in the record that any residual oils, or VOCs, such as benzenes, toluenes, ethylbenzenes or xylenes, were saturated in the floors and walls of the Breaker Island facility." *Id.* at 4. USX has demonstrated an absence of disputed facts regarding its release of hazardous substances, and thus its liability.

NiaMo's expert witness, Joseph P. Lewandowski ("Lewandowski"), testified that the basis for his opinion that the demolition on Area 1 constituted a release was that there were hazardous substances found there. *Id.* Ex. L at 96–97. He further stated that there were operations on the site prior to USX's ownership that would produce the same hazardous substances. *Id.* at 97. The assertion that the demolition between 1902 and 1921 resulted in the release of hazardous substances is refuted by the conclusion of NiaMo's Interim Remedial Measures Study for Area 1 that a remedial investigation/feasibility study should not be done. (Pl.'s Ex. 1 at

R–NMPC 000390.) The conclusion was based upon a finding that there was no source area of PAHs and no significant concentration of MGP-related by-products present at Area 1. *Id.* The only recommended action was to remove surface coal tar residues found at discrete locations. *Id.*

Regarding Area 2, again his entire basis for concluding that a release occurred during USX's tenure was the demolition of buildings and the later presence of hazardous substances. (Murphy Aff. Ex. L at 105.) it is clear that his opinions regarding Areas 1 and 2 are based merely upon inferring from the occurrence of an activity in the early 1900s and the fact that hazardous substances were later found on the property, that the activity must have constituted a release of a hazardous substance. Lewandowski opined that there must have been a release of hazardous substances in Area 4 during that time because the land area grew in acreage and hazardous substances were found during the remedial investigation. *Id.* at 105. Soil borings at Area 4 indicated presence of ash, slag, cinders, and tar-like materials. However, there is no evidence that USX deposited ash, slag, cinders, and tar-like materials there. *Id.* Ex. P at 31–32. In fact, the change in topography that is the basis for the assertion that Area 4 increased in land acreage during USX's ownership occurred between 1885 and 1916, not between 1902 and 1921 (the period of USX's ownership). *Id.* Ex. L at 787.

In sum, there is no evidentiary basis for the opinions of NiaMo's experts.[9] Rather, they rely upon supposition and speculation.

9. NiaMo argues that experts may rely upon circumstantial evidence to support their opinions. The following quote from the case cited by NiaMo demonstrates a properly supported circumstantial basis for an expert opinion:
As an expert witness, Dr. Ball could use his "specialized knowledge" of reliable techniques and methods (as opposed to "specialized knowledge" of the incident in question) to form an opinion. Specifically, he could use the chromatography results to determine that the solvents on Nutra-Sweet's property were of the same type (were from the same source) as those on X–

NiaMo has introduced no specific facts; it has not raised even a metaphysical doubt as to the material facts. Viewing the evidence in the light most favorable to NiaMo, there is no genuine issue of material fact regarding a release of hazardous substances during USX's ownership of the property.

Accordingly, summary judgment must be granted in favor of USX. Additionally, all cross-claims for CERCLA contribution against USX and by USX against other defendants will be dismissed as moot and USX's motion to preclude expert testimony will be denied as moot.

### 5. *Chevron*

There are several issues with respect to Chevron. First, at issue is whether Chevron can be held liable as a current owner of contaminated property when the DEC has suspended the investigation of the only property this defendant currently owns, Area 3. Second, at issue is whether it is entitled to a petroleum exclusion regarding the operation of its asphalt terminal. Another issue with respect to Chevron is whether it can be held liable as an owner at the time of a release, or as an arranger, when a lessee covered pre-existing coal tar pits. Finally, at issue is whether Chevron is entitled to judgment as against the Rensselaer defendants based upon their current ownership of Area 4.

### a. *Chevron as Current Owner of Area 3*

■ Chevron contends that it cannot be held liable as a current owner pursuant to § 9607(a)(2) because it is not a current owner of Areas 2 or 4, where NiaMo is incurring response costs related to MGP waste. In other words, Chevron contends that Area 3 should not be considered part of the CERCLA facility because no MGP wastes have been found there. NiaMo argues that hazardous wastes derived from petroleum products, which do not fall within the CERCLA petroleum exception, have been found on Area 3, which Chevron currently owns, therefore making Chevron the current owner of property on which hazardous substances are found. Moreover, Chevron is the current owner of an easement through Area 2, over which an above-ground pipeline runs. NiaMo argues that hazardous substances have been found in the area of the pipeline. However, Chevron contends that any such substances fall within the petroleum exclusion.

The arguments regarding the separability of Area 3 are convincing on their face. There is no evidence of coal tar on Area 3, with the exception of Hudson River sediments. The Hudson River sediments have been designated as operable unit 2 of Area 4 and will be addressed as a whole at some later time. For the purposes of investigation and remediation each of the designated areas are being treated separately by the DEC and NiaMo. The DEC postponed any investigation of Area 3, and Area 3 is not included in NiaMo's remediation plan at this time. Further, coal storage was the only MGP-related activity that occurred on Area 3.

---

L's property. Through groundwater migration test results, he could trace some of the concentrated solvents on NutraSweet's property as migrating from X–L's property. Through soil degradation, he could determine the relative ages of the solvents on the two sites. He could then combine this information, the aerial photographs, and the fact that X–L used solvents that would produce the VOCs found on both properties (and NutraSweet did not) and come up with a theory (or opinion) as to where the solvents came from and how they got there: X–L's activities.

*NutraSweet Co. v. X–L Eng'g Co.*, 227 F.3d 776, 789 (7th Cir.2000). The contrast between the foregoing and the basis for NiaMo's expert's opinions is startling.

However, clearly the CERCLA facility at issue here is the MGP facility. Throughout the time period during which NiaMo operated the MGP facility all of the property, including Areas 1, 2, 3, and 4, were treated and considered as a whole. The MGP operated on Area 2 generating primarily coal tar and purifier oxide box waste. Some waste was disposed of at Area 2 and some was transported by rail or truck, across Area 3, for disposal at Area 4. While it may seem inequitable to assign strict liability to an owner of land (even if such owner did not dispose of hazardous waste) upon which, along with other parcels of land, a previous owner operated a facility that created large amounts of hazardous waste and who disposed of the waste upon other portions of the facility, that is exactly how CERCLA is designed. *See* 42 U.S.C. § 9607(a)(1); *Alcan Aluminum*, 315 F.3d at 184 (describing the strict liability nature of CERCLA); *Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 76 (1st Cir.1999) (same). Moreover, Chevron admits that there are pockets of MGP waste in Area 3. (Chevron's Resp. to Pl.'s Cont'd 7.1 Statement ¶ 171, Docket No. 368; Oral Arg. Tr. at 171.) Thus, it would be an unnatural division to carve out Area 3 from the MGP facility. *See 150 Acres of Land*, 204 F.3d at 708–09. Further, the easement that Chevron owns transverses Area 2, which is widely contaminated with MGP wastes and for which there is no dispute that NiaMo has incurred response costs.

Chevron is a current owner of a portion of the former MGP facility upon which a hazardous substance was released for which remediation costs have been incurred and therefore is a "covered person" liable for response costs. *See* § 9607(a).

Chevron argues that NiaMo has not incurred response costs related to Area 3 or the area of its pipeline easement because any release there was of a petroleum or asphalt product is excluded from CERCLA. Thus, Chevron argues, a prima facie case for contribution has not been established. *See Alcan Aluminum*, 315 F.3d at 184 (setting forth the elements of a prima facie case). It is unnecessary to determine at this juncture whether any contaminants found in these areas are exempted from CERCLA because, again, NiaMo has incurred response costs related to the MGP facility, which is what is at issue here. Whether any such petroleum or asphalt contamination would fall within the CERCLA exclusion would go to separability of harm.

NiaMo moves to strike the affidavit of Chevron's expert Kenneth B. Siet ("Siet"), upon which Chevron relies for its argument that its petroleum and asphalt operations used or produced only materials subject to the CERCLA exclusion. NiaMo argues that new opinions are rendered that were not included in the expert disclosure, and that it would be prejudiced by the use of such new opinions. Specifically, NiaMo contends that Siet renders new opinions about the presence and impact of naphtha, kerosene and cutback asphalt at the asphalt terminal. However, the expert report describes the asphalt emulsion operation, including naphtha and kerosene. (*See* Siet Aff. Ex. A at 14.) Further, there is no surprise creating prejudice that cutback asphalt includes naphtha and kerosene, when the expert report referenced the use and presence of naphtha and kerosene. Careful review of the expert disclosure and the Siet affidavit reveals that there is no new opinion offered in the affidavit not disclosed in the expert report. (*See generally* Siet Aff. & Ex. A.) Accordingly, the motion to strike the Siet affida-

vit must be denied.[10]

■ Chevron moves to preclude testimony by NiaMo's expert, Neil J. Petersen ("Petersen") regarding the source of tar- or asphalt-like weeps in Hudson River sediments. Petersen's expertise is in organic geochemistry, not analytical chemistry. (Higgins Aff. Ex. J. at 21, 49.) The common method for identifying the signature of a contaminant is by analysis of gas chromatography/flame ionization detection ("GS/FID") or gas chromatography/mass spectrometry ("GC/MS") chromatograms. By one of these tests it is possible to determine if contamination is petroleum-based and identify specific contaminants found. It may also be possible to determine the source of a contaminant. *See, e.g., id.* at 58–61 (describing generally the methodology of analyzing chromatograms). A chromatogram may reveal a certain chemical signature that identifies the source of a contaminant as a specific compound, for example, gasoline.

Petersen's work has mostly been involved with analyzing GS/FID chromatograms in order to identify compounds such as fuel oil and gasoline. Less than one percent of the analytical work he has done involved asphaltic compounds. *Id.* at 79. Here Petersen reviewed over one hundred GS/MS chromatograms. *Id.* at 134. He separated out the ones that he concluded were pure coal tar based upon the signature characteristics of coal tar. *Id.* All of the uncontaminated samples showed at least a coal tar contribution. *Id.* at 136. Those samples that exhibited an unresolved complex mixture ("UCM") were categorized as not pure coal tar. *Id.* at 137. Hydrocarbons, found in all petroleum products, comprised the UCMs. *Id.* at 136–37. Petersen then looked at the chromatograms of these samples, decided based upon his own experience what type of hydrocarbon source the UCM indicated, and sorted them by type on this basis. *Id.* at 141–54. Based upon this sorting, Peterson opined that two of the types of hydrocarbon source represented on some of the chromatograms was asphaltic. *Id.* In sum, there was no scientific basis for this sorting by type, just his experience. While extensive practical experience can be a valid basis for an expert opinion, *McCullock,* 61 F.3d at 1043, here it is not. Petersen's extensive experience has been in analyzing GC/FID chromatograms to identify sources such as fuel oil and gasoline (and not asphalt), whereas here he was analyzing GC/MS chromatograms to identify asphaltic sources. Further, Petersen did not have any method for verifying differing results obtained by the contract laboratory on the same sample (Higgins Aff. Ex. J at 163–175, 223–24) and did not compare the sample chromatograms with any type of standard signature, even his personal reference book, *id.* at 195. Also, no attempt was made to determine a source of the asphalt, for example, by comparing it to that from a paving company located north of the area or to any asphalt found in other locations at the Water Street Site. *Id.* at 201–04.

Petersen's testimony regarding the asphaltic contribution to contamination in Hudson River sediments is unreliable and must be excluded. Based upon this determination, it is unnecessary to address the parties' relevance arguments. Chevron's motion to exclude this testimony must

---

**10.** While it is recognized that this determination is not required due to the finding that the petroleum exclusion is not relevant at this juncture, this ruling is made in the interest of efficiency since the petroleum exclusion argument will undoubtedly arise during the next phase of this litigation.

therefore be granted.[11]

Chevron may be liable as a current owner, as it is a responsible person, that currently owns property upon which hazardous substances are found. However, it remains to be determined if NiaMo remediation is consistent with the NCP, an essential element of a contribution claim. *See Buffalo Color Corp.,* 139 F.Supp.2d at 417–18 (finding it improper to grant summary judgment before it is determined whether any costs incurred were consistent with the NCP). Also for determination in Phase II is whether, in fact, as Chevron suggests, no remediation is required upon property it currently owns or for which it is responsible because it owns an easement, such that Chevron's proportionate share would be zero, *see Acushnet Co.,* 191 F.3d at 76 (finding apportionment of no liability to a PRP justified under equitable allocation), or that any harm caused by hazardous substances found on its property are separable from those being remediated by NiaMo. *See Redwing Carriers Inc. v. Saraland Apartments,* 94 F.3d 1489, 1514 n. 32 (11th Cir.1996) (finding it proper to distinguish among separate harms in the allocation analysis). Thus, NiaMo is not entitled to summary judgment on liability as to Chevron as a current owner, and Chevron is not entitled to summary judgment dismissing the CERCLA claims against it.

**b.** *Chevron as Former Owner/Operator or Arranger/Transporter of Area 4*

██ NiaMo contends that Chevron must be held liable as a former owner or arranger/transporter because it owned Area 4 at the time when Republic Steel, lessee of the property, attempted to cover the exposed tar disposal lagoons with soil or slag. NiaMo contends that this action caused the tar to be moved, thus constituting a disposal or discharge of hazardous wastes. Chevron contends that, to the contrary, there was no disposal and it is entitled to judgment as a matter of law on this claim.

Chevron has set forth evidence that covering of the coal tar pits on Area 4 was a state of the art remediation at the time it occurred, in approximately 1960. (*See* Siet Aff. ¶¶ 26–32, Ex. A at 15.)[12] It further sets forth evidence that the shape of the pits was not changed by this action. *Id.* Ex. G at 1001. It is not necessary to determine if Republic Steel's actions were a remediation for which liability does not attach, because NiaMo has not shown that an issue of fact exists as to whether there was a release or threatened release at the time Chevron owned Area 4.

NiaMo points to the affidavit of an expert, filed in a bankruptcy proceeding, which it characterizes as an opinion that covering the coal tar lagoons with ash, soil, and/or slag "exacerbated" the releases and threats to the environment posed by the industrial area. (Pl.'s Ex. 164 (Metzger Decl.) ¶¶ 9, 15.) However, a reading of the entire paragraph upon which NiaMo relies reveals that the expert did not opine that the covering of the pits "exacerbated" a release. Rather, the expert opined that

---

**11.** Again, determination of this issue is not necessary at this juncture, since any asphaltic source evidence pertains to separability of damages. However, in the interest of judicial efficiency this motion is addressed here.

**12.** NiaMo's response to Chevron's 7.1 Statement asserts that it has moved to strike the Siet affidavit because the expert disclosure does not reveal the opinion about state of the art remediation. (*See* Pl.'s Resp. 7.1 Statement ¶ 32 (Doc. No. 361).) Review of that motion reveals that this is not the basis upon which NiaMo relied. Thus, this assertion of fact about state of the art remediation stands as set forth in Chevron's 7.1 Statement.

covering the pits would have reduced the rate of contaminant release through runoff, but that any exposed tar, because some tar had seeped up to the surface, would be exposed to runoff. The expert opined:

> The placement of slag/soil covering in 1960 may have regraded the area and altered surface runoff patterns. As a result, *the covering slag/soil may have reduced the rate of contaminant release* through surface runoff. It may also have caused displacement of some of the tar deposits, due to differences in specific density and buoyancy properties of the tar deposits relative to the overlying slag/soil cover. By placing the heavier slag/soil cover over the lighter coal tar, the pressure may have forced semi-fluid coal tar materials along paths of least resistance, eventually to emerge along the surface, and eastern and western sides of the site. These weeps exist all along the ridgeline (See Exhibit 1), both on the eastern (roadside) slope, as well as the western (riverside) slope of the disposal area. *Once these tar extrusions surfaced, they would then be exposed to precipitation/runoff, and contribute to surface water/sediment contamination as well as subsurface soil contamination.*

*Id.* ¶ 15 (emphasis added). In sum, the expert opines that covering the pits with soil and slag was not completely effective in eliminating contamination through surface runoff. Moreover, this expert concluded "to a reasonable scientific certainty, that hazardous materials entered the environment of the Troy site prior to 1955 [when Chevron acquired the property and Republic Steel began its operations there] from the moment tar was placed into the ground and continued to migrate into the surrounding soil and ground water in the years following 1955." *Id.* ¶ 19. There is no opinion that covering the pits "exacer-

bated" a release or threatened release of hazardous substances. *See generally id.* ¶¶ 9–19.

NiaMo's proffered evidence in opposition does not include any expert opinion or other evidence that a release actually occurred, a required element of a prima facie case for contribution liability. NiaMo equates Republic Steel's covering the pits with soil or slag with "grading and filling a construction site." *See Redwing Carriers,* 94 F.3d at 1512 (holding "that a 'disposal' may occur when a party disperses contaminated soil during the course of grading and filling a construction site"). However, NiaMo has not proffered evidence that Republic Steel dispersed contaminated soil during this activity. In fact, the evidence shows that Republic Steel merely covered the open pits, at least one of which had caught fire, with soil and slag, not that there was a dispersal of contaminated soil throughout the site. Here the coal tar remained in the pits where it was deposited by NiaMo during MGP operations.

Chevron met its initial burden of showing that no release or threatened release occurred relating to Republic Steel's covering the Area 4 coal tar lagoons. NiaMo failed to adduce evidence that a genuine issue of material fact exists in this regard. Accordingly, Chevron is entitled to judgment as a matter of law on the claim against it as an owner/operator at the time of a release or threatened release or as an arranger/transporter with regard to covering the Area 4 tar pits.

### c. *Rensselaer Defendants*

Chevron moves for summary judgment on its claims against the Rensselaer defendants as current owners of Area 4. No opposition was submitted to this motion, and the Rensselaer defendants' motion to extend time to respond, made after oral

argument was heard, was denied. Failure to oppose a motion is deemed as consent to the granting of the motion. *See* L.R. 7.1(b)(3). Further, it is clear that the Rensselaer defendants currently own Area 4, property upon which hazardous substances are found. Thus, the Rensselaer defendants are liable as current owners for contribution pertaining to Area 4 to the extent that Chevron would be liable for response costs greater than its proportionate share. However, given the conclusion that Chevron (as a former owner/operator or transporter/arranger) is not liable in contribution to NiaMo for a proportionate share of the Area 4 response costs, Chevron's cross-claims for contribution against the Rensselaer defendants are moot, as are these third-party defendants' counterclaims for contribution against Chevron. Accordingly, since Chevron is the only party making a claim against the Rensselaer defendants, and they make counterclaims only against Chevron, the third party action may be dismissed in its entirety.

### 6. *Portec*

▇ NiaMo contends that Portec operated a portion of the Water Street Site, the Wynantskill Creek, at the time a disposal occurred and therefore is liable as a former operator and arranger. Portec contends that it never owned or operated any part of the Water Street Site, and that there is no evidence that it caused a release of hazardous substances there.

NiaMo points to evidence in the record that spills of hazardous substances occurred on the Portec Property, PCB-contaminated transformers and pits containing oily debris and liquids were found there, and that sampling on that property shows the presence of trichloroethylene ("TCE"), trichloroethane ("TCA"), tetrachloroethene, 1,2–dichloroethene, phenanthrene, bis(2–ethylhexyl) phthalate, and

Aroclor–1248. NiaMo argues that these hazardous substances and oils migrated from the Portec Property into the Wynantskill Creek and the Hudson River contaminating them. NiaMo further points to the fact that PAHs and petroleum hydrocarbons have been found in Wynantskill Creek and the Hudson River sediments. However, there is no evidence of any such migration and no evidence that any disposal that occurred on Portec Property is in any way connected to the contamination at Area 2 for which NiaMo is responsible to remediate. Further, no investigations or remedial actions will be undertaken by NiaMo relating to the Wynantskill Creek. (Capra Aff. Ex. J at R–NMPC 005633.)

NiaMo cites *Nutrasweet Co. v. X–L Eng'g Corp.*, 933 F.Supp. 1409, 1419 (N.D.Ill.1996), *aff'd*, 227 F.3d 776 (7th Cir. 2000), in support of the proposition that actual migration of substances need not be shown, but the only showing need be that the release on defendant's property caused plaintiff to incur response costs. Even if it is true (which Portec disputes) that PCB-contaminated transformers; pits containing oily debris and liquids; and TCE, TCA, tetrachloroethene, 1,2–dichloroethene, phenanthrene, bis(2–ethylhexyl) phthalate, and Aroclor–1248 have been found on Portec property, that is not enough to hold Portec liable. There must be evidence that NiaMo has or will incur response costs at Area 2 related to these findings. Absent such evidence, Portec cannot be held liable. Similarly, even though PAHs were found in the Wynantskill Creek and Hudson River sediments, that is insufficient to impose liability. No remediation is being done as to the Wynantskill Creek sediments and investigation and remediation of MGP-related contamination of Hudson River sediments will be undertaken separately. (Capra Aff. Ex. J. at R–NMPC 005633.) In short, there is no factual support for any release

on Portec Property that caused NiaMo to incur response costs.

This is unlike the situation in *Nutrasweet Co.* In that case, an employee of the defendant was observed frequently dumping a bucket of liquid near the plaintiff's property. 933 F.Supp. at 1413. Testing of soil at the dumping location revealed the presence of chlorinated and other VOCs, which are the byproducts of chlorinated solvents. *Id.* Testing on plaintiff's property adjacent to the dumping location showed high concentrations of chlorinated and other VOCs. *Id.* at 1414. Thus, there was a nexus between the dumping and the contamination on plaintiff's adjacent property sufficient to infer that the dumping caused plaintiff to incur response costs, without requiring the dumping to have been directly upon plaintiff's property, or even that the liquid dumped migrated to the property. *Id.* at 1419–20.

Here, NiaMo has shown no nexus between any purported release on Portec property and remediation it must undertake at Area 2. Thus, Portec cannot be held liable on this basis.

■ NiaMo also seeks to hold Portec liable by virtue of its membership in the Wynantskill Improvement Association. The Wynantskill Improvement Association regulated the flow of water through the creek, in order to enhance the operations of it members, industries located along its shores. The Wynantskill Improvement Association was not named as a defendant in the complaint. NiaMo cites no case in support of its proposition that a single member of a non-profit association, such as the Wynantskill Improvement Association, that regulates the flow of a body of water is an "operator" for the purposes of

CERCLA based upon that fact alone. Accordingly, Portec is entitled to judgment as a matter of law that it is not responsible as an "operator" of the Wynantskill Creek.

NiaMo again cites *Nutrasweet Co.*, 933 F.Supp. at 1419, in support of the proposition that a neighboring landowner can be held liable as an arranger when the disposal of hazardous substances on its property contaminates neighboring property. In *Nutrasweet Co.*, a defendant[13] argued that it could not be held liable as an arranger because it had not dumped hazardous substances on plaintiff's property (rather, it had dumped such substances on its own property). *Id.* at 1420. The court found that because defendant's disposal of hazardous substances caused plaintiff to incur response costs, it could be held liable as an arranger. *Id.* It is clear that in *Nutrasweet Co.*, unlike here, defendant's release caused plaintiff to incur response costs. There, the contamination was byproducts of chlorinated solvents, which defendant stored and used in relatively large quantities, and dumped near plaintiff's property. *Id.* The contamination on defendant's and plaintiff's property was of the same hazardous substances, found at adjacent portions of the parties' properties. *Id.* at 1421.

Here the alleged disposal by Portec was primarily chlorinated solvents (byproducts of which are, for example, TCA and TCE) on the Portec Property. The hazardous substances being remediated by NiaMo are MGP wastes such as coal tar (byproducts of which are, for example, PAHs and BTEX). Portec did not use or store coal tar, and there is no evidence of any coal tar located on Portec Property. Assuming arguendo that Portec did dispose of hazardous substances as NiaMo contends,

13. Although one defendant was a corporate officer, for simplicity of discussion the defendant is treated as a corporation.

that simple fact is insufficient to hold it liable as an arranger because no nexus has been demonstrated between such disposal and the contamination being remediated that caused NiaMo to incur response costs.

Portec has demonstrated that no genuine issue of fact exists as to the CERCLA claims against it as a former owner/operator and arranger. NiaMo has not set forth sufficient evidence from which reasonable persons could conclude that Portec is so liable. Accordingly, summary judgment in favor of Portec must be granted as to all CERCLA claims against it brought directly by NiaMo and as cross-claims by the other defendants.

### D. Summary Judgment Motions on the Merits–Remaining Claims

#### 1. N.Y. Navigation Law Claims

 NiaMo seeks summary judgment on its Navigation Law claims as to each defendant against whom it has brought such claim, Conrail, King, USX, Chevron, Portec, and APU. Defendants first seek dismissal of NiaMo's claims, because, as a discharger of petroleum products itself, it is precluded from bringing such claims.

It is undisputed that light and heavy oils were byproducts of NiaMo's MGP operations, and that petroleum products were spilled at times during the MGP operations. (See, e.g., Higgins Aff. Ex. J at 49–51.) Thus, as a discharger of petroleum products itself, NiaMo cannot make a claim against other alleged dischargers under the Navigation Law. See N.Y. Nav. L. § 172(3) (McKinney Supp.2003); White, 85 N.Y.2d at 569, 626 N.Y.S.2d 989, 650 N.E.2d 836. NiaMo argues that even if it is not entitled to bring a direct claim under § 181, it is still entitled to contribution under § 176(8). However, NiaMo has not shown that it has incurred response costs caused by the discharge of petroleum by

any of these defendants. In fact, NiaMo has specifically stated that it is remediating only MGP-related wastes. NiaMo's Navigation Law claims must be dismissed.

Additionally, Chevron contends that it is entitled to judgment as a matter of law with regard to its New York Navigation Law counterclaims against NiaMo. However, Chevron has not shown that it has incurred any response costs relating to any petroleum discharges by NiaMo. As Chevron aptly points out, failure to show that it sustained an injury caused by another party is fatal to its Navigation Law claim. See, e.g., N.Y. Nav. Law § 181(5) (providing that "any injured person" may bring action against the discharger); Popolizio v. City of Schenectady, 269 A.D.2d 670, 671, 701 N.Y.S.2d 755 (2000). Thus, Chevron is not entitled to summary judgment as to liability on its Navigation Law counterclaims.

#### 2. Other State Law Claims

 NiaMo seeks summary judgment on its contribution claims against all defendants brought pursuant to N.Y.C.P.L.R. § 1401. Defendants seek dismissal of these claims. State law contribution claims are preempted as against parties liable under CERCLA. Idylwoods Assocs. v. Mader Capital, Inc., 915 F.Supp. 1290, 1314 (W.D.N.Y.1996). The state law contribution claims must therefore be dismissed as against King and Chevron. As to the other defendants, the state law contribution claims must fail because they are not "subject to liability for damages for the same ... injury to property." See N.Y. C.P.L.R. § 1401. Similarly, NiaMo's indemnification claims fail.

NiaMo argues that it is entitled to partial summary judgment on its unjust enrichment (restitution) claims against King and Chevron. NiaMo contends that King

and Chevron have failed to remediate hazardous waste at their properties, which NiaMo is now doing, therefore unjustly enriching these defendants. NiaMo has not set out the elements of this cause of action nor met the initial burden of demonstrating that no genuine issue of fact exists. Accordingly, it is not entitled to judgment as a matter of law on the unjust enrichment claim.

■ NiaMo also moves for partial summary judgment on its public nuisance claim against Conrail, King, USX, Chevron, Portec, and APU; and defendants seek dismissal of the claim on statute of limitations as well as substantive grounds. The three-year statute of limitations set forth in N.Y. C.P.L.R. § 214–c applies to the public nuisance claim. *See Town of New Windsor v. Tesa Tuck, Inc.*, 919 F.Supp. 662, 675 (S.D.N.Y.1996). NiaMo relies upon *Oliver Chevrolet, Inc. v. Mobil Oil Corp.*, 249 A.D.2d 793, 794–95, 671 N.Y.S.2d 850 (1998), in support of its argument that a six-year period, as set forth in § 213(2), should apply because this claim should be considered an action for indemnification rather than one for property damage. However, the *Oliver Chevrolet* Court clearly differentiated a nuisance claim, applying a three-year limitations period, and an indemnification claim. *Id.* at 794–95, 671 N.Y.S.2d 850. The court's reasoning is instructive. It reasoned that indemnification claims arise from an implied contract, where the party responsible for making the payment is entitled to reimbursement from the actual wrongdoer. *Id.* at 795, 671 N.Y.S.2d 850. When that situation is contrasted with the situation here, where NiaMo seeks payment from defendants for a proportionate share of remediation costs allegedly caused by them, it is clear that the nature of the nuisance claim is property damage as opposed to indemnification. Thus, NiaMo's public nuisance claim is time-barred.

NiaMo further contends that it is now entitled to a declaratory judgment that each defendant is liable for past and future response costs in connection with the investigation and remediation of the Water Street Site. As NiaMo has not prevailed on its motion for summary judgment as to any defendant, and the remaining defendants proportionate share of liability has yet to be determined, it is premature to issue a declaratory judgment.

NiaMo has not made any motion with regard to Chevron's counterclaims for negligence, trespass, nuisance, N.Y. Navigation Law and federal common law. Similarly, no motion has been made by Conrail, King, or Portec regarding Chevron's cross-claims for negligence, trespass, nuisance, N.Y. Navigation Law and federal common law. Given the prior determinations that Conrail and Portec have no liability with regard to the remediation at the Water Street Site, Chevron's cross-claims against those defendants will be dismissed.

## V. CONCLUSION

NiaMo is not entitled to contribution protection pursuant to 42 U.S.C. § 9613(f)(2). However, its motion to dismiss the CERCLA counterclaims is granted because counterclaims are superfluous in a contribution action. In taking the allegations of the counterclaims as true, defendants state claims under the New York Navigation Law, and plaintiff's motion to dismiss on that basis is denied. Defendants' remaining state law counterclaims do not lack specificity and NiaMo's motion to dismiss pursuant to Fed.R.Civ.P. 8 is denied.

NiaMo is not precluded from bringing a contribution claim because it was not subject to a current or past CERCLA enforcement action. Thus, Conrail's cross-

motion for judgment on the pleadings is denied.

The CERCLA facility at issue here does not include the Railway Property. Conrail is entitled to judgment as a matter of law dismissing the contribution claims against it. Further, Conrail's cross-claims for contribution are dismissed as moot. Similarly, APU is entitled to dismissal of the contribution claims against it, and cross-claims for contribution by and against it are dismissed as moot.

King is a responsible person pursuant to CERCLA as a current owner and arranger. NiaMo is not entitled to judgment on the issue of liability as against King as there has been no showing of response cost consistency with NCP. Allocation of damages relating to King also remains for trial.

There is no evidentiary basis for the opinions of NiaMo's experts that demolition at Areas 1 and 2 and changes in topography at Area 4 constituted a disposal by USX. USX is entitled to summary judgment dismissing the CERCLA contribution claims (both direct and cross-claims) against it. Further, contribution claims by USX against other defendants are dismissed, and USX's motion to preclude expert testimony is denied, as moot.

Area 3 is a natural part of the former MGP facility, and, as such, cannot be unnaturally carved out from the CERCLA facility. Thus, Chevron is a responsible person under CERCLA by virtue of its current ownership of Area 3. However, NiaMo is not entitled to partial summary judgment as against Chevron because no showing has been made that the response costs incurred are consistent with the NCP. Consistency with the NCP and allocation of damages relating to Area 3 remain issues for trial.

Chevron's expert did not render new opinions that would prejudice NiaMo therefore the motion to strike the Siet affidavit is denied. The opinion of NiaMo's expert, Petersen, relating to sourcing of contaminants in Hudson River sediments has no valid scientific basis, rendering it unreliable. Chevron's motion to exclude his testimony in this regard is granted.

Chevron met its initial burden of demonstrating the absence of a material fact with regard to a release or threatened release at Area 4 when Republic Steel covered the coal tar pits. NiaMo did not adduce evidence that a genuine issue of fact exists. Chevron is entitled to summary judgment dismissing the claims against it as former owner/operator at the time of a release or threatened release and as an arranger/transporter. Chevron's claims against the Rensselaer defendants for contribution based upon their current ownership of Area 4 are moot, as it has been determined that Chevron has no liability for response costs relating to Area 4. Further, no other parties make claims against the Rensselaer defendants. Thus, the third party action is dismissed in its entirety.

The Portec Property is not a part of the Troy Water Street Site nor the CERCLA facility at issue here; therefore, Portec is not a responsible person based upon current ownership of property where hazardous substances are located. Moreover, no genuine issue of material fact exists as to Portec's responsibility as a former owner/operator at the time of a release of hazardous substances or as an arranger. Portec is entitled to summary judgment dismissing all CERCLA contribution claims against it that were brought by NiaMo and as cross-claims by other defendants.

As a discharger of petroleum products, NiaMo is precluded from bringing contri-

bution claims under the New York Navigation Law § 181. Further, no showing has been made that NiaMo has incurred response costs for remediation of any hazardous substances other than MGP-related wastes. Thus, NiaMo's Navigation Law claims are dismissed. Chevron is not entitled to judgment as a matter of law with regard to its Navigation Law counterclaims against NiaMo because it has not shown that it has incurred any response costs relating to petroleum discharges by NiaMo. Chevron's Navigation Law counterclaims must be determined at trial.

NiaMo's N.Y. C.P.L.R. § 1401 claims against King and Chevron are dismissed because these claims are preempted as against CERCLA responsible persons. The § 1401 claims against the other defendants and the indemnification claims against all the defendants fail because the defendants are not subject to liability for the same injury to property as is NiaMo. NiaMo is not entitled to partial summary judgment on its unjust enrichment and restitution claims against King and Chevron because it did not meet its initial burden of demonstrating that no genuine issue of fact exists as to these claims. The unjust enrichment and restitution claims must be determined at trial. NiaMo's public nuisance claim is dismissed as time barred. Summary judgment on liability has not been granted as to any of NiaMo's claims; therefore, a declaratory judgment will not issue.

No motions were directed to Chevron's counterclaims or cross-claims. Therefore, also awaiting disposition at trial are Chevron's counterclaims for negligence, trespass, nuisance, N.Y. Navigation Law and federal common law against NiaMo. Chevron's cross-claims against King for negligence, trespass, nuisance, N.Y. Navigation Law and federal common law await trial. However, Chevron's cross-claims

against Conrail and Portec are dismissed given the determination that these defendants have no liability with regard to remediation at the Water Street Site.

Remaining for trial in Phase I on the issue of CERCLA liability is whether NiaMo's response costs are consistent with NCP. Also remaining for trial in Phase I regarding liability generally are NiaMo's unjust enrichment (restitution) claims against King and Chevron, and King's and Chevron's counterclaims and cross-claims. Remaining for trial in Phase II is the apportionment of damages among NiaMo, King and Chevron.

Accordingly, it is

ORDERED that

1. NiaMo's motion for summary judgment (Docket No. 324) is DENIED;

2. NiaMo's motion to dismiss defendants' counterclaims (Docket No. 218) is GRANTED IN PART and all CERCLA counterclaims are DISMISSED; and DENIED IN PART with regard to state law counterclaims;

3. NiaMo's motion to strike the affidavit of Kenneth B. Siet (Docket No. 318) is DENIED;

4. Conrail's cross-motion for judgment on the pleadings (Docket No. 233) is DENIED;

5. Conrail's motion for summary judgment (Docket No. 301) is GRANTED and all claims and cross-claims against it are DISMISSED;

6. USX's motion for summary judgment (Docket No. 253) is GRANTED and all claims and cross-claims against it are DISMISSED;

7. USX's motion to preclude expert testimony (Docket No. 272) is DENIED as moot;

8. Chevron's motion for summary judgment (Docket No. 350) is GRANTED IN PART and all claims and cross-claims against it relating to Area 4 are DISMISSED; and DENIED IN PART as to the CERCLA claims and cross-claims against it relating to Area 3 and as to the Rensselaer defendants;

9. Chevron's cross-motion (Docket No. 224) is GRANTED IN PART and certain testimony of Neil J. Peterson, as described above, is EXCLUDED; and DENIED IN PART with respect to the alternative relief of amending the complaint;

10. Portec's motion for summary judgment (Docket No. 288) is GRANTED and all claims and cross-claims against it are DISMISSED;

11. APU's motion for summary judgment (Docket No. 205) is GRANTED and all claims and cross-claims against it are DISMISSED;

12. NiaMo's Navigation Law, contribution, indemnification, and public nuisance claims are DISMISSED; and

13. The third-party action is DISMISSED in its entirety.

IT IS SO ORDERED.